IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| ROBIN CLAUDIO o/b/o E.P.I.C., | CASE NO. 3:21-cv-1661-JRK |
| Plaintiff, | JUDGE JAMES R. KNEPP II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Robin Claudio filed a Complaint against the Commissioner of Social Security (Commissioner) on behalf of her minor son E.P.I.C., seeking judicial review of the Commissioner's decision denying supplemental security income (SSI). (ECF #1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 26, 2021, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2022-03. (Non-document entry dated February 15, 2022). Following review, and for the reasons stated below, I recommend the District Court **REVERSE** the Commissioner's decision and **REMAND** the case for additional proceedings consistent with this recommendation.

1

PROCEDURAL BACKGROUND

Ms. Claudio filed for SSI on E.P.I.C.'s behalf in May 2019, alleging a disability onset date of September 18, 2018. (Tr. 63). The claim was denied initially and on reconsideration. (Tr. 69, 85). Ms. Claudio then requested a hearing before an Administrative Law Judge. (Tr. 100). On August 3, 2020, E.P.I.C. (represented by counsel) and Ms. Claudio appeared for a hearing by telephone and testified before the ALJ. (Tr. 38-62). On October 9, 2020, the ALJ found E.P.I.C. not disabled in a written decision. (Tr. 18-31). On July 8, 2021, the Appeals Council denied Ms. Claudio's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4; 20 C.F.R. §§ 416.1455, 416.1481). Ms. Claudio timely filed this action on August 26, 2021. (ECF #1).

FACTUAL BACKGROUND

I.   RELEVANT MEDICAL AND EDUCATIONAL EVIDENCE

On November 13, 2018, E.P.I.C. was referred for an autism evaluation based on restricted behaviors, language/speech delays, and social interactions. (Tr. 320).

**First assessment for special education services.** In January 2019, E.P.I.C., then seven years old, presented to Ohio Virtual Academy's evaluation team for assessment for special education services based on Ms. Claudio's concerns related to E.P.I.C.'s behavior, hyperactivity, inattention, sleep disturbances, and resistance to writing, and on observations of non-compliance and verbal and physical outbursts. (Tr. 253). Ms. Claudio reported E.P.I.C. is an excellent reader when he wants to read but does not stay engaged and will refuse to continue if he is not interested in the reading material. (Tr. 263). E.P.I.C. loves drawing but hates writing. (*Id.*). He is defiant, hyperactive, requires lots of redirection during class sessions if he is not interested in the subject,

and has daily meltdowns that interfere with his ability to learn. (Tr. 263-64). He is also creative, intelligent, intuitive, imaginative, great at memorizing, and enjoys collecting and video games. (Tr. 264). Ms. Claudio noted E.P.I.C. does not comprehend social cues and does not exhibit good social skills. (*Id.*).

In Fall 2018, E.P.I.C. started homeschooling. (Tr. 257). His benchmark scores were above average in math, average in reading, and below average for comprehension. (Tr. 265). During testing, the evaluator observed E.P.I.C. humming or making noises when working. (*Id.*). He also asked if he was finished and stated he did not want to do anymore work. (*Id.*). Benchmark scores in January 2019 were all average. (*Id.*).

On January 22, 2019, a school psychologist assessed E.P.I.C.'s cognitive ability by administering the Wechsler Intelligence Scale for Children, Fifth Edition (WISC-V). (Tr. 267). The evaluator noted E.P.I.C. stood up and sat down often, tapped his hands on the table, and when tasks became difficult he "would lay his head on the table, make a pretend cry or whimper, say 'I don't know,' and/or just not answer, or say 'It's too difficult.'" (*Id.*). Results from the WISC-V revealed a full-scale IQ of 111, placing E.P.I.C. in the High Average range. (Tr. 267-68). When assessing E.P.I.C.'s academic skills, the psychologist noted E.P.I.C. would stop working when the testing became more difficult and would say "It's too hard" or "This is boring." (Tr. 270). E.P.I.C. was unable to solve any math problems involving money or word problems that did not have pictures. (*Id.*). When required to write in full sentences, E.P.I.C. put his head on the table and stopped writing. (*Id.*).

In addition to testing, the assessment included observations of E.P.I.C. during class, a behavior assessment, and a parent report. (Tr. 262-64). The report concluded: "He demonstrates

overall high average cognitive ability, and on track reading, writing, and math skills. Through observation and parent report, [E.P.I.C.] demonstrates refusal or avoidance behaviors with non-preferred tasks." (Tr. 275). Because additional data and observation were necessary in order to determine potential educational needs, the evaluation team determined E.P.I.C. was not eligible for special education services as of February 14, 2019. (Tr. 275-76).

**Autism Spectrum Disorder evaluation.** On March 22, 2019, E.P.I.C. was evaluated for Autism Spectrum Disorder (ASD) at Haugland Therapy Services. (Tr. 229). Ms. Claudio completed several assessments and questionnaires, including Behavior Assessment System for Children, Third Edition (BASC-III); the Adaptive Behavior Assessment System, Third Edition (ABAS-III); Conner's Rating Scales, Third Edition (CRS-3); and the Social Communication Questionnaire (SCQ). (*See* Tr. 229-33).

The BASC-III provides information about a child's current social-emotional functioning. (Tr. 229). Scaled scores in the "clinically significant" range suggest a high level of maladjustment. (Tr. 229-30). Scores in the "at-risk" range identify a significant problem that may not be severe enough to warrant formal treatment, or may identify the potential of developing a problem that needs careful monitoring. (Tr. 230). E.P.I.C.'s scored scales were clinically significant for hyperactivity, atypicality, withdrawal, social skills, activities of daily living, anger control, developmental social disorders, executive functioning, and negative emotionality; at-risk for aggression, conduct problems, depression, attention problems, adaptability, leadership, functional communication, bullying, emotional self-control, and resiliency; and average for anxiety and somatization. (Tr. 230).

The ABAS-III assesses adaptive skills and is designed to evaluate whether an individual displays the various functional skills necessary for daily living without assistance from others. (Tr. 231). E.P.I.C. scored below typical ranges in most skills, including communication, self-direction, leisure, social, home living, health and safety, and self-care; and within typical range as to his functional academic skills. (Tr. 232). The General Adaptive Composite revealed a scaled score of 75, placing E.P.I.C. at the fifth percentile, indicating a low range of functioning. (*Id.*).

The CRS-3 provides diagnostic information about academic, social, and emotional behaviors at home. (Tr. 232). Scores range between "markedly atypical," which indicates a significant problem, and "average," which indicates a typical score and is not a concern. (Tr. 232). E.P.I.C.'s scores indicate no learning problems but significant problems in the areas of inattention, hyperactivity/impulsivity, executive functioning, defiance/aggression, and peer relations. (Tr. 233).

The SCQ is a parent report screening measure that "taps the symptoms associated with" ASD.  (Tr. 231). E.P.I.C.'s score did not meet the criteria for ASD. (*Id.*).

The evaluators administered the Autism Diagnostic Observation Schedule, Second Edition (ADOS-2), a semi-structured, standardized assessment of communication, social interaction, and play/imaginative use of materials. (Tr. 233). E.P.I.C. scored just below the range for classification of ASD. (*Id.*).

The evaluators interviewed Ms. Claudio. (Tr. 233-35). She reported E.P.I.C. was not fully potty-trained and refused to use the restroom for bowel movements. (Tr. 233). Within the year, E.P.I.C. had been diagnosed with ADHD and pica.[1] (*Id.*). Ms. Claudio reported her relationship

---

[1]      Pica is an eating disorder characterized by eating substances that are not food and do not provide nutritional value. National Eating Disorders Association, *Pica*, https://www.nationaleatingdisorders.org/learn/by-eating-disorder/other/pica (last visited August

with E.P.I.C. was close but strained due to his behavioral issues. (Tr. 234). She described E.P.I.C. as very successful academically. (*Id.*). Before being homeschooled, E.P.I.C. struggled in school due to behavioral outbursts and noncompliant/oppositional behaviors. (*Id.*). He continues to demonstrate these behaviors at home; if E.P.I.C. does not want to complete his work he refuses and becomes very upset, resulting in arguing, screaming, verbal aggression, throwing objects, eloping, and occasionally biting himself. (*Id.*). Ms. Claudio also reported E.P.I.C. struggles to focus on work; he answers impulsively and his difficulty sitting for extended periods of time. (*Id.*). Ms. Claudio described odd hand mannerisms and hypersensitivity to loud noises such as the blender or vacuum. (*Id.*). She reported E.P.I.C. constantly eats and places non-food items in his mouth, like small toys. (*Id.*). E.P.I.C. also struggles to wash, dress, and feed himself, and to fall asleep and stay asleep. (Tr. 235).

Ms. Claudio noted E.P.I.C. will not spontaneously engage with other children but will respond appropriately if other children approach him. (Tr. 234). He maintains relationships only with cousins or other family members and has always struggled to make friends. (*Id.*).

Ms. Claudio reported E.P.I.C.'s struggles with inattention, impulsivity, hyperactivity, and poor emotional self-regulation skills. (Tr. 235). She described him as irritable, forgetful, having trouble remaining focused on non-preferred activities, reluctant to engage in tasks that require sustained mental effort, and easily distracted. (*Id.*). E.P.I.C. often interrupts others when they are talking, has difficulty waiting his turn, will run or climb in inappropriate settings, does not demonstrate a regard for his personal safety, and elopes from the home. (*Id.*).

---

5, 2022). It is developmentally inappropriate behavior and often cooccurs with other mental health disorders associated with impaired functioning such as ASD. *Id.*

On observation, the evaluator noted rapport was easily established with E.P.I.C. (*Id.*). He demonstrated fluent and flexible speech and was quick to offer information to the evaluator, but only inquired about the evaluator's thoughts and feelings on Pokemon and videogames and was resistant to changing the subject away from his own interests. (*Id.*). E.P.I.C. was able to report a routine event, brushing his teeth, but "required probing to fully report a non-routine event." (*Id.*). E.P.I.C. demonstrated shared enjoyment with the evaluator but did not spontaneously identify emotions in others and demonstrated difficulty communicating his own emotions. (*Id.*). E.P.IC.'s "social overtures were appropriate but limited to periods when speaking of his own interests." (*Id.*). The evaluator did not observe unusual sensory interests, repetitive behaviors, compulsions, or rituals, but did note that E.P.I.C. "was extremely active, rarely remained seated, and was very easily distracted by extraneous stimuli." (*Id.*).

Based on an interview with Ms. Claudio, a diagnostic interview with E.P.I.C., and the results of the assessments and questionnaires, the evaluators determined E.P.I.C. met the criteria for ASD. (Tr. 236). E.P.I.C. demonstrated deficits in social-emotional reciprocity; deficits in developing, maintaining, and understanding social relationships; and highly restricted, fixated interests. (Tr. 336). The evaluator also determined E.P.I.C. met the criteria for ADHD and Opposition Defiant Disorder (ODD). (*Id.*).

**Second assessment for special education services**. Ms. Claudio shared the results of the autism evaluation with Sandusky City Schools' evaluation team. (*See* Tr. 385). On January 22, 2020, the school's evaluation team determined E.P.I.C. was eligible for special education services. (Tr. 371). The decision was based on E.P.I.C.'s demonstrated educational needs in the areas of communication and behavior, "significant difficulty with verbal and nonverbal communication,

social interaction, resistance to environmental change in daily routines, stereotyped movements, and unusual responses to sensory experiences which inversely impact his educational performance." (*Id.*).

As part of the second evaluation, Ms. Claudio completed a questionnaire in which she described concerns and difficulties, including writing, work refusal, attention/focus, peer and adult relationships, behavior meltdowns, test anxiety, self-harm (biting), chewing odd substances, non-compliance, frequent nightmares, excessive activity, and impulsive behavior. (Tr. 400). Ms. Claudio also expressed concern with E.P.I.C.'s poor emotional self-regulation and nonverbal communication related to personal boundaries. (Tr. 401).

A school psychologist assessed E.P.I.C.'s background history, general health, general intelligence, academic skills, classroom-based evaluations and progress in the general curriculum, social-emotional status, and behavior. (Tr. 384). The evaluator noted that writing tasks were the most difficult for E.P.I.C. to complete; when required to write sentences, he would lay his head down and stop writing. (Tr. 386). "[He] demonstrated escape behavior by leaving his seat and telling the evaluator it was too boring." (*Id.*). While administering the KTEA-3 (an assessment of reading, math, and language skills), the evaluator noted E.P.I.C. "was observed to stand or walk around the testing table for the majority of the assessment. [He] took 3 breaks in between subtests." (*Id.*). He was more attentive during certain subtests, but still needed two to four redirections and prompts to answer. (Tr. 386-87). During the writing fluency subtest, E.P.I.C. required verbal praise and encouragement to produce writing samples. (Tr. 387). Based on the results of the KTEA-3, E.P.I.C. demonstrated average skills in word recognition, reading

comprehension, math computation, math problem solving, and spelling. (Tr. 387). His refusal behavior during the writing fluency subtest produced a low standard score. (*Id.*).

An occupational therapist assessed E.P.I.C.'s sensory and fine motor skills. (Tr. 392). The therapist evaluated the extent of E.P.I.C.'s ability to integrate his visual and motor abilities (eye-hand coordination). (*Id.*). The assessment revealed average visual-motor integration, visual perception, and motor coordination. (Tr. 393). The therapist noted her observations, including that E.P.I.C. uses a whole left-hand grasp to hold writing utensils, has difficulty holding two or more objects in his palm to manipulate to the fingertips, and can draw simple pictures. (*Id.*). E.P.I.C. can dress himself but requires assistance with buttons and snaps on clothing, and is unable to tie his shoes. At eight years old, E.P.I.C. is showing more interest in using the toilet for bowel movements. (*Id.*). He requires assistance opening packages and containers. (*Id.*). While E.P.I.C. uses a fork and spoon, he still has difficulty using a knife to cut food. (*Id.*). The therapist also performed sensory testing. (Tr. 393-94). During testing, which involved drawing, stringing beads, folding paper, using scissors, writing letters and numbers, and copying an 11-word sentence, E.P.I.C. maintained an appropriate level of regulation to complete tasks and did not refuse or show frustration with writing tasks. (Tr. 394).

A speech pathologist, Leslie Zimmerman, M.A., CCC/SLP, determined his ability to use language-based skills of social interpretation and interaction with friends "are well below the expected skill level for a child his age." (Tr. 401). On observation, she noted E.P.I.C. was "easily distracted and presented with a short attention span. His body was restless when seated at the table. [E.P.I.C.] was active throughout the evaluation." (Tr. 395). When given a break to look at Pokemon pictures, E.P.I.C. enjoyed teaching Leslie about each character. (*Id.*). At about thirty

minutes into the evaluation, E.P.I.C. began to pace the room and stood on a chair. (*Id.*). After E.P.I.C. complied with Ms. Zimmerman's directive to sit on the chair, she suspended the evaluation so that he "could experience movement during the assessment of fine motor skills with the occupational therapist." (*Id.*). When the speech and language evaluation resumed, E.P.I.C. was allowed to explore a basket of toys while answering questions. (*Id.*). He was attentive to the visuals and considerate with his responses. (*Id.*).

Receptive and expressive language skills were average. (Tr. 395-96). E.P.I.C.'s social and pragmatic language skills were assessed using the Social Language Development Test, comprised of four sub-tests (Making Inferences, Interpersonal Negotiation, Multiple Interpretations, and Supporting Peers) consisting of question-answering tasks, interpretations of photographed scenes, and verbal explanations. (Tr. 397).

The Making Inferences subtest requires the child to infer what someone in a picture is thinking and examines the child's ability to use information from facial features, body language, and context to respond. (*Id.*). E.P.I.C. performed below average, suggesting he may have difficulty taking personal responsibility for behaviors and comments that affect others and may find it difficult to use visual clues to make inferences about a person's perspectives, emotions, and intentions. (Tr. 397-98). The Interpersonal Negotiation Subtest assesses a child's ability to resolve personal conflicts in the absence of visual stimuli. (Tr. 398). E.P.I.C. performed below average, suggesting he may have difficulty with age appropriate strategies to negotiate conflict with peers and may be considered immature or bossy. (*Id.*). The Multiple Interpretations subtest measures the way in which a child makes a logical inference from a picture and then thinks flexibly by inferring yet another interpretation of the same scene. (*Id.*). E.P.I.C.'s performance revealed borderline

impairment, suggesting he may be at risk for misunderstanding exceptions to the rules or changes in routine, may often misinterpret nonverbal or context clues, may not easily consider alternative explanations, and is at risk for misinterpreting interactions, story character actions, and beliefs. (*Id.*). The Supporting Peers subtest measures what children might say in various situations to support or please a peer. (*Id.*). E.P.I.C. showed impairment, suggesting he may struggle to support his peers, have difficulty making and retaining friends, and be perceived as inconsiderate of others. (*Id.*).

Ms. Zimmerman concluded: "On this assessment of his communication skills, [E.P.I.C.] demonstrated strengths with understanding and use of vocabulary (semantic) and sentence structures (syntax). He presented with an educational need to develop an understanding and use of supralinguistic and pragmatic language skills."[2] (Tr. 399). She explained that deficits in these skills may affect his listening, problem solving, reading comprehension, study skills, decision making, and social relationships. (Tr. 399).

The evaluation team reviewed three recorded video observations of E.P.I.C. during which he was asked to complete writing and reading tasks. (Tr. 381). The first recording was described as follows:

> At the beginning of the observation [E.P.I.C.] is being told by his mother to not break his phone. [He] appears frustrated and begins to walk up the stairs in his house. He yells at his mother, "Go away!" When told he may need a time-out he replies by yelling back at his mother. When asked why he's angry, [E.P.I.C.] yells and clenches his fist as he moves down the staircase. His mother states, "Well, I still love you." [He] comes further down the staircase. He is distracted when he hears a dog barking

---

[2]       Ms. Zimmerman explains "Pragmatic social skills encompass the social appropriateness of interactions, making inferences, executive functioning, critical thinking, and nonverbal communication. Supralinguistic language skills are the comprehension and use of complex language in which meaning is not directly available from lexical or grammatical information." (Tr. 399).

in the distance. When his mother asks if he would like to sit in the hammock he angrily says no and hugs his mother.

(*Id.*). The second video was described as follows:

> At the beginning of the observation [E.P.I.C.] is laying on a couch with what looks like a phone or small tablet in his hand. His mother asks him to get books. [E.P.I.C.] states twice he does not want to do the books and then throws the small electronic device into nearby couch cushions. [E.P.I.C.] is standing at this point. Throughout the observation, [E.P.I.C.] is laying down on the couch or walking around the room. [His] mother tells [him] it is time to write, he replies by yelling, "No!" [E.P.I.C.] then grabbed a book from the shelf and threw it on the floor and shouts, "I hate writing!" [He] sits on the couch and tells his mother he isn't doing any learning and he is dropping out of school. He then says he is giving up. [E.P.I.C.] deescalates and agrees to "text writing."

(Tr. 382). The third video, in which Ms. Claudio is sitting with E.P.I.C. while reading a story titled

"Origin of Fields," was described as follows:

> Before the story was read out loud to [E.P.I.C.], verbally protested stating "That's going to be too hard" and "Can we do this Wednesday instead?" Mother sat next to [E.P.I.C.] with book open asking him to read out loud. [E.P.I.C.] stated, "I can't read." [E.P.I.C.] asked if mom could read the story to him. When she indicated 'no,' he went under and walked away from the table. [E.P.I.C.] threw his pencil, started taking deep breaths, and stated "I need to relax." He walked away from the table for approximately three and a half minutes. [He] returned to the table by his mother's request. He read another sentence and then walked away and said, "I give up." When his mother offered for him to read Pokemon instead, [he] complied and came back to the table. He flipped through 2 pages without reading out loud. When asked by his mother to read from the Pokemon book, [E.P.I.C.] told her he couldn't read because his throat hurt. When asked to read aloud from the Pokemon book, [he] said, "The words are too small." [E.P.I.C.] was presented with the original story to read out loud. When [he] was asked to read from the book, [he] pretended to read the book by reading very quickly; which was unable to be interpreted. In other words, he wanted to rush through the story.
>
> The reviewed 16 minute video was a 2nd attempt of recording him performing a reading and writing task. On the first recorded attempt, [E.P.I.C.] noticed himself being filmed and bit the phone, leaving teeth-mark impressions.

(*Id.*). In all videos, E.P.I.C. was not observed to perform any writing or reading task. (Tr. 400).

The evaluation team determined certain accommodations would be helpful for E.P.I.C., including a visual schedule, structured breaks, prior conversations for instances of changes in his daily routines, a visual timer, preferential seating in close proximity to the instructor, extended time to complete assignments, allow extended time to complete written assignments, offer typed assignments over written assignments when applicable, and pencil grips. (Tr. 372).

## II.    OTHER RELEVANT EVIDENCE

**Function Report.** Ms. Claudio completed a Child Function Report on June 5, 2019. (Tr. 181). The Function Report is based on a series of yes/no questions related to the child's abilities. Ms. Claudio reported E.P.I.C.'s ability to communicate is limited. (Tr. 184). He can tell jokes and riddles accurately, and talks with friends and family, but is unable to deliver telephone messages, repeat stories he heard, explain why he did something, or use sentences with "because," "what if," or "should have been." (*Id.*). E.P.I.C.'s ability to progress in learning is limited; he cannot write in longhand, write a simple story with six to seven sentences, add or subtract numbers over 10, make correct change, or tell time. (Tr. 185).

Ms. Claudio was unsure if E.P.I.C.'s physical abilities were limited, but noted E.P.I.C. is unable to ride a bike, jump rope, use roller skates or roller blades, swim, use scissors, or dress/undress dolls and action figures. (Tr. 186). Ms. Claudio was also unsure if E.P.I.C.'s impairments affect his behavior with other people but noted E.P.I.C. does not have friends his own age, is unable to make new friends, and does not play team sports. (Tr. 187). Ms. Claudio also noted E.P.I.C. was unable to use zippers, button clothes, tie shoelaces, take a bath or shower without help, brush his teeth, comb his hair, eat using a knife, fork, and spoon, pick up and put away toys, hang up clothes, or help around the house. (Tr. 188). Additionally, E.P.I.C. does not do

13

what he is told most of the time, does not obey safety rules (such as looking for cars before crossing

the street), and is unable to accept criticism or correction. (Tr. 188). Ms. Claudio reported E.P.I.C.

can keep himself busy and works on arts and crafts projects, but does not finish what he starts,

complete his homework, or complete chores most of the time. (Tr. 189).

## III.   MEDICAL OPINIONS

On August 12, 2019, Juliette Savitscus, Ph.D., a state agency psychological consultant,

reviewed E.P.I.C.'s records and completed a Childhood Disability Assessment. (Tr. 67-68). Dr.

Savitscus concluded E.P.I.C. had no limitation in acquiring and using new information, moving

about and manipulating objects, and health and physical wellbeing; and less than marked

limitations in attending and completing tasks, interacting and relating with others, and caring for

himself. (*Id.*). Dr. Savitscus explained her assessment regarding the domain of attending and

completing tasks as follows:

> **Rating:** Less than marked.
> **Psychology**: During the assessment, [E.P.I.C.] was extremely active, rarely remained seated, and was very easily distracted by extraneous stimuli. Mother endorses many [symptoms] of ADHD. Not on medication. Does not qualify for special ed.

(Tr. 68). Dr. Savitscus explained her assessment regarding the domain of interacting and relating

with others as follows:

> **Rating**: Less than marked.
> **Psychology**: Per assessment observations, [E.P.I.C.] integrated gestures (except for descriptive gestures), eye contact, and directed facial expression frequently and appropriately into his speech. He demonstrated shared enjoyment with the examiner during multiple activities. [E.P.I.C.] did not spontaneously identify emotions in others during the assessment and demonstrated difficulty communicating differences between typical social relationships, but was able to demonstrate some insight into his role in relationships, such as stating what he does that will irritate or annoy others. [E.P.I.C.'s] social overtures were appropriate but limited to periods when speaking of his own interests. He was able to demonstrate the use of imagination/creativity during multiple activities. No unusual sensory interests,

14

repetitive behaviors, compulsions or rituals observed. Mother reports that [he] does not spontaneously engage with peers, but will respond appropriately when they engage with him. Has struggled to make friends. Can be opposition with parents. [Diagnosed] ODD, mild severity.

(*Id.*).

On January 23, 2020, Bryan Krabbe, Psy.D., performed a psychological evaluation. (Tr. 414). Ms. Claudio expressed behavioral concerns, reporting that E.P.I.C. bites himself, has multiple meltdowns a day, will kick when he gets angry, and is always energetic. (Tr. 416). She reported problems with mood, social withdrawal, difficulty concentrating, insomnia, angry outbursts, and recklessness. (*Id.*). She also reported E.P.I.C. does not engage in back and forth conversation, offers limited eye contact, has difficulty making friends, is inflexible with rigid adherence to routines, has fixated interests that are abnormal in intensity or focus, is hyper-reactive to sensory input, displays repetitive movements, and lacks social and emotional reciprocity. (*Id.*).

Dr. Krabbe determined the information Ms. Claudio provided appeared to be reliable. (Tr. 418). Dr. Krabbe noted E.P.I.C. was fidgety and would not sit still in his chair and frequently interrupted his mother. (Tr. 416). He did not display any emotional disturbances during the interview but was "impulsive, out of his chair, and touching items in the office." (*Id.*). E.P.I.C. obeyed his mother and Dr. Krabbe when given a directive, but "displayed less than age appropriate attention as he frequently needed to be redirected and questions repeated during the evaluation." (Tr. 417).

Dr. Krabbe determined E.P.I.C. would have difficulty acquiring new information based on the problems with distraction E.P.I.C. displayed on evaluation. (Tr. 418). As to E.P.I.C.'s ability to attend and complete tasks, Dr. Krabbe did not offer an opinion but noted that he displayed effective task persistence and WISC-V scores suggest adequate concentration and attention, but

E.P.I.C. has a diagnosis for ADHD and has regularly occurring problems with attention and concentration during school and at home, including impulsive behavior, being easily distracted, and restlessness. (Tr. 419). Dr. Krabbe determined that observed symptoms of impulsivity and inattentiveness may interfere with E.P.I.C.'s ability to get along with others, but that he had adequate levels of intellectual functioning to understand and respond to others. (*Id.*). Lastly, Dr. Krabbe determined E.P.I.C. has less than age-appropriate management of self-care with personal hygiene, dressing, and completing chores, and a less than age-appropriate ability to regulate his emotions. (*Id.*).

On January 28, 2020, Bonnie Katz, Ph.D, a state agency psychological consultant, reviewed the records on reconsideration and completed a Childhood Disability Assessment. (Tr. 81-83). Dr. Katz concluded E.P.I.C. had no limitations moving about and manipulating objects or health and physical wellbeing; less than marked limitations in acquiring and using information, attending and completing tasks, and interacting and relating with others; and a marked limitation in caring for himself. (*Id.*). Dr. Katz explained her assessment regarding the domain of attending and completing tasks as follows:

> **Rating:** Less than marked.
> **Psychology**: Haugland psych assessment 3/19: During the assessment, [E.P.I.C.] was extremely active, rarely remained seated, and was very easily distracted by extraneous stimuli. Mother reports [claimant] cannot focus or concentrate and is restless and fidgety. She endorses many [symptoms] of ADHD. 11/19 Peds visit notes [claimant] on Clonidine, reported by mom to be targeting ADHD, ODD, and sleep [disorder symptoms].
>
> [Reconsideration] 1/23/20 psych [consultative examiner] gives the diagnoses of unspecified ADHD and autism spectrum disorder. The claimant displayed problems with distraction during the evaluation. The claimant displayed effective task persistence when answering questions. The claimant displayed indications of distraction during the evaluation. The claimant has regularly occurring problems with attention and concentration in school. The claimant has regularly occurring

problems with attention and concentration at home including impulsive behavior, being easily distracted, and restlessness.

(Tr. 82). Dr. Katz explained her assessment regarding the domain of interacting and relating with

others as follows:

> **Rating**: Less than marked.
> **Psychology**: Per assessment observations, [E.P.I.C.] integrated gestures (except for descriptive gestures), eye contact, and directed facial expression frequently and appropriately into his speech. He demonstrated shared enjoyment with the examiner during multiple activities. [E.P.I.C.] did not spontaneously identify emotions in others during the assessment and demonstrated difficulty communicating differences between typical social relationships, but was able to demonstrate some insight into his role in relationships, such as stating what he does that will irritate or annoy others. [E.P.I.C.'s] social overtures were appropriate but limited to periods when speaking of his own interests. He was able to demonstrate the use of imagination/creativity during multiple activities. No unusual sensory interests, repetitive behaviors, compulsions or rituals observed. Mother reports that [he] does not spontaneously engage with peers, but will respond appropriately when they engage with him. Has struggled to make friends. Can be opposition with parents. [Diagnosed] ODD, mild severity and ASD Level 1 without accompanying language impairment.
>
> At [reconsideration] level, 1/23/20 psych [consultative examiner] gives the diagnosis of unspecified ADHD and autism spectrum disorder. The claimant presented as impulsive during the evaluation, which may affect the level of engagement with others.

(Tr. 82-83). Dr. Katz explained her assessment regarding the domain of caring for yourself as

follows:

> **Rating**: Marked.
> **Psychology**: Per mother's report, often irritable. 3/19 parent ABAS-III in the borderline range. Parent reports to 10/18 psych [consultative examiner] that [claimant] is wild and has tantrums multiple times a day, on a daily basis when he can't get his own way. Mom reports [claimant] taking meds for encopresis (noted in 11/19 peds visit).
>
> At [reconsideration], parent reports that [claimant] cannot be left unattended due to poor safety awareness, that he bites himself when he becomes angry, and that he needs assistance with toileting and dressing. He has severe restrictions in what foods he is willing to eat and mom reports he eats non-food items. 1/23/20 psych

17

> [consultative examiner] reflects this report and observes [claimant] was impulsive and had difficulty sitting still at exam. [Consultative examiner] opines [claimant] with less than age appropriate ability to regulate emotions, including frequent temper tantrums (though this was not observed at interview), and that [claimant's] ASD may lead to increased emotional instability and withdrawal.

(Tr. 83).

The Disability Adjudicator determined E.P.I.C. was not disabled because "The medical records and evidence in file shows that while he does have limitations due to his conditions, these problems are not so severe that they prevent him from doing most things that other children his age can do." (Tr. 85, 87).

**IV.    ADMINISTRATIVE HEARING**

The following summarizes the testimony of E.P.I.C. and Robin Claudio, presented during the hearing before the ALJ.

E.P.I.C. lives with his mother, father, and older brother. (Tr. 43). E.P.I.C. likes to play computer and video games and watch videos. (Tr. 44). He plays by himself because he does not have friends. (Tr. 44). E.P.I.C. claimed he could ride a bike. (Tr. 45). He is able to read and enjoys drawing. (Tr. 48). E.P.I.C. testified he had difficulty doing homework but could do math quickly. (Tr. 49).

He does not have friends in the neighborhood. (Tr. 45). When asked if he has friends at school, E.P.I.C. responded, "I don't really know." (Tr. 46). E.P.I.C. can pick out his own clothes but has difficulty with putting on his shoes. (*Id.*). He is able to brush his teeth but does not comb his hair because it hurts too much. (*Id.*). His mom helps him bathe. (*Id.*).

18

E.P.I.C. has no chores except to take out the bathroom garbage. (Tr. 47). E.P.I.C. sleeps with his mother and wakes up easily. (*Id.*). E.P.I.C. did not know what time he wakes up. (*Id.*). He takes medicine for sleeping. (*Id.*). He wants to be a serious gamer when he gets older. (Tr. 50).

Ms. Claudio then testified. She corrected E.P.I.C.'s testimony: he has a bike but is unable to pedal properly, so he does not ride it. (Tr. 57). E.P.I.C. has a number of chores but he mostly takes the small trashcan out. (Tr. 52). He needs to be reminded, or bribed, and often refuses to do the chore. (*Id.*). E.P.I.C. can brush his own teeth and dress himself, but will usually wear clothing inside out and backwards if she does not assist him. (*Id.*). Ms. Claudio confirmed E.P.I.C. cannot put on socks and shoes. (Tr. 52). E.P.I.C. loves math, though he has difficulty understanding the concepts of time and money. (Tr. 53). He struggles with writing and outright refuses to do so. (*Id.*).

When E.P.I.C. is upset, he elopes, sometimes running into the street. (*Id.*). He receives a transportation accommodation for this reason. (*Id.*). When Ms. Claudio takes E.P.I.C. outside the home, she must hold his hand because he will run off; when in stores, E.P.I.C. runs towards the parking lot. (Tr. 59). "If I take him for a walk even, he'll run out towards the street. He knows it's dangerous. He's been told a million times, and I believe he understands it. He is pretty intelligent, I think, but he will do it anyway." (*Id.*). It also happens at home. (*Id.*). For that reason, the Claudios' house has childproof locks on all of the doors. (*Id.*).

Ms. Claudio described how E.P.I.C. interacts with other people. (Tr. 54). In a social setting, E.P.I.C. does not interact with other children, preferring to "do his own thing." (*Id.*). If encouraged to interact with other children, E.P.IC. will introduce himself but then goes off in his own direction. (*Id.*). Ms. Claudio testified, "I wouldn't say he doesn't get along with other kids. He just doesn't seem to have a lot of desire to play with other children." (*Id.*). For instance, when

E.P.I.C.'s similarly-aged cousin visits, E.P.I.C. will play video games with his cousin, but will not leave the video game when his cousin suggests another activity. (*Id.*). He does not care if he plays alone, so long as he does what he wants. (Tr. 55). E.P.I.C. takes melatonin for sleep. (Tr. 56). He used to take clonidine for sleep, but it increased the frequency of nightmares and adversely decreased his appetite. (*Id.*; *see* Tr. 224). He often will not lay down for bed until midnight. (Tr. 58).

When asked why she believes E.P.I.C. is disabled, Ms. Claudio explained he needs assistance with, or simply won't do, simple things that children his age can do. (Tr. 56). For instance, brushing, washing, and cutting E.P.I.C.'s hair is a tremendous struggle. (Tr. 56-57). He has fits of rage, kicks, and runs. (Tr. 57). He cannot go outside and play unattended because, while they have a fully fenced yard, E.P.I.C. has pica and has been caught eating worms, plants, rocks, sticks, and dirt. (*Id.*). E.P.I.C. will only sleep with one blanket and refuses to sleep without it. (Tr. 58). If, at midnight when he lies down for bed, he thinks the blanket smells weird because the dog laid on it, he will stay up until Ms. Claudio washes and dries the blanket. (*Id.*). E.P.I.C. has tried to run off when he is frustrated with schoolwork, but is more apt to become aggressive and destroy items, such as his laptop and books, or start eating the paper. (Tr. 59-60).

E.P.I.C.'s counsel gave a closing statement, noting that the state agency psychological consultant determined E.P.I.C. had a marked limitation in caring for himself. (Tr. 60). Counsel argued that the same evidence the agency consultant relied on to make that conclusion and Ms. Claudio's additional observational testimony also satisfies finding a marked limitation in attending and completing tasks. (Tr. 61).

## V.    PERSONAL EVIDENCE

E.P.I.C. was 7 years old at the time of his alleged onset date, September 18, 2018, and 9 years old at the time of the administrative hearing. (Tr. 63).

## THE ALJ'S DECISION

The ALJ's decision of October 9, 2020, included the following findings of fact and conclusions of law:

1. The claimant was born on July 27, 2011. Therefore, he was a school-age child on May 3, 2019, the date application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since May 3, 2019, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: autism spectrum disorder; oppositional defiant disorder; attention deficit hyperactivity disorder (ADHD); sleep disturbances; and Pica. (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925, and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

6. The undersigned finds that the claimant has not been disabled, as defined in the Social Security Act, since May 3, 2019, the date the application was filed (20 CFR 416.924(a)).

(Tr. 19-30).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

1.  Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2.  Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3.  Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). The six domains are: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for yourself; and health and physical well-being. *Id.* § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized

testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference.

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

### DISCUSSION

Ms. Claudio first claims the appointment of Andrew Saul as the Commissioner of the Social Security Administration violated the separation of powers and, as such, a written decision from an ALJ who derives her authority from Mr. Saul is constitutionally defective, entitling E.P.I.C. to remand for a *de novo* hearing. (Pl's Br., ECF #8, PageID 543). Ms. Claudio next argues the ALJ failed to consider significant evidence when evaluating the functional domains, and erred by failing to consider Listing 112.10 for ASD. (*Id.* at PageID 546-47, 553).

The Commissioner concedes the language in 42 U.S.C. § 902(a)(3) restricting the President's ability to remove the Commissioner only for "neglect of duty or malfeasance of office" violates the separation of powers because it limits the President's authority to remove the Commissioner without cause. (Comm'r's Br., ECF #10, PageID 567). However, the Commissioner argues E.P.I.C. has not shown the kind of harm necessary to entitle him to remand. (*Id.* at PageID 567-68).

As explained below, I agree with the Commissioner and conclude that, as to § 902(a)'s removal provision, E.P.I.C. has not shown the harm necessary to entitle him to remand for a *de novo* hearing. However, I find the ALJ did not provide sufficient analysis for the domains of attending and completing tasks and interacting and relating with others.

## I.    The Constitutional Challenge

Initially, I conclude E.P.I.C. has not forfeited his ability to raise his constitutional challenge even though he did not advance this argument at the administrative level. (*See* Pl.'s Br., ECF #8, PageID 546). In *Carr v. Saul*, 141 S. Ct. 1352 (2021), the Supreme Court held a claimant does not need to exhaust a constitutional claim at the administrative level, but instead may present such a claim for the first time at the district court level. *Id.* at 1362. But E.P.I.C. is still not entitled to an order of remand from this Court.

In *Seila Law LLC v. Consumer Financial Protection Bureau,* 140 S. Ct. 2183, 2197 (2020), the Supreme Court found that a statutory restriction on the President's ability to remove the head of an agency "only for inefficiency, neglect, or malfeasance" violates the separation of powers and is unconstitutional. The Court further found the offending clause was severable from the other portions of its Act, thereby maintaining CFPB intact as an agency. *Id.* at 2208, 2211.

25

Subsequently, in *Collins v. Yellen*, the Court considered the Federal Housing Finance Agency (FHFA) and its enabling statute, which contained a provision stating that the head of FHFA was removable by the President "only 'for cause.'" 141 S.Ct. 1716, 1770 (2021). The Court concluded such a provision violated the separation of powers and was unconstitutional. *Id.* Relying on *Seila Law,* the Court further explained the unconstitutionality of a removal provision does not strip an agency head of the authority to carry out the other functions of the office. *Collins*, 141 S.Ct. at 1788; *see also id.* at n.23 ("Settled precedent also confirms that the unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . .") (citing *Seila Law*, 140 S.Ct. at 2207-11). Instead, to obtain remand, the plaintiff must demonstrate "compensable harm" flowing from the unconstitutional removal clause. *See id.* at 1788-89. The absence of a nexus between the purported harm and the challenged removal restriction "defeats the . . . argument for setting aside" agency action. *See id.* at 1787.

Ms. Claudio claims E.P.I.C. did not receive a valid administrative process because the ALJ's authority to make disability determinations was derived from a Commissioner who was subject to an unconstitutional removal provision. (Pl.'s Br., ECF 8, PageID 544). In addition, she claims, "Mr. Saul implemented changes to HALLEX and new regulations which impacted [him] and his application for benefits," and therefore, he was harmed by "the modifications which were implemented during [Mr.] Saul's tenure as Commissioner." (*Id.* at PageID 545). E.P.I.C. does not specifically identify the changes to HALLEX or the new regulations, nor does he address how those changes affected his specific case. Ms. Claudio also asserts that President Biden terminated Mr. Saul and noted that Mr. Saul "had undermined and politicized Social Security disability benefits." (Pl.'s Br., ECF #8, PageID 545). Because of this, Ms. Claudio argues that "it can be

inferred that the policy adjudication framework and processes established by Mr. Saul was the primary and lead reason for President Biden's dissatisfaction." (*Id.*). However, again, Ms. Claudio does not explain how this affected E.P.I.C.'s specific case. Ms. Claudio was required to trace the ALJ's unfavorable decision to the unlawful conduct, and she failed to do so. These arguments are, therefore, without merit.

As in *Collins,* the existence of an unconstitutional removal provision did not strip Commissioner Saul of his authority to carry out the functions of his office, including the authority to delegate disability determinations to ALJs and to implement changes to Agency regulations. Without a showing that § 902(a)(3)'s removal restriction inflicted specific, compensable harm on him, remand for a *de novo* hearing is not available to him.

Moreover, the specific ALJ who presided over E.P.I.C.'s case—Judge Carey—was not appointed by a Commissioner subject to § 902(a)(3)'s removal restriction, but rather was ratified by an Acting Commissioner who was not tenure-protected. (*See* Comm'r's Br., ECF #10, PageID 569, fn. 3). Because Acting Commissioner Berryhill served pursuant to provisions of the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345-3349c, her appointment was not subject to the same constitutional deficiencies as Commissioner Saul. *See* 5 U.S.C. § 3346(a)(1). Acting Commissioner Berryhill had no statutory tenure protections. *See* 42 U.S.C. § 902(b)(4); *see also Collins*, 141 S. Ct. at 1782-83 (noting that FHFA's Acting Director was removable at-will because the relevant subsection "does not include any removal restriction. Nor does it cross-reference the earlier restriction on the removal of a confirmed Director."); *United States v. Eaton*, 169 U.S. 331, 343 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby

27

transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered.").

Because Acting Commissioner Berryhill was not the "superior and permanent official" as a confirmed director, she was removable at-will; thus, there is no nexus between Acting Commissioner Berryhill's ratification of Judge Carey's appointment and the unconstitutional provisions of § 902(a)(3). As a result, I conclude Ms. Claudio has not shown that Acting Director Berryhill or Judge Carey lacked authority to carry out the functions of their respective offices due to the constitutional defect in § 902(a)(3). *See Collins*, 141 S. Ct. at 1788 n.23 (noting that "unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office . . . ").

Other federal courts in this judicial district, this state, and across the country, have concluded that the allegedly unconstitutional appointment of Andrew Saul does not require remand. *See, e.g., Katrina R. v. Comm'r of Soc. Sec.*, No. 2:21-CV-4276, 2022 WL 190055, at *5 (S.D. Ohio Jan. 21, 2022) (collecting cases); *Miley v. Comm'r of Soc. Sec.*, No. 1:20-CV-2550, 2021 WL 6064754, at *9 (N.D. Ohio Dec. 22, 2021). I similarly decline to recommend remand on this basis.

Because Ms. Claudio has not articulated a specific, compensable harm E.P.I.C. sustained as a result of the unconstitutional removal provision in § 902(a)(3), the constitutional challenge fails.[3]

---

[3]     Given this determination, it is unnecessary for me to address the Commissioner's alternative arguments opposing Ms. Claudio's constitutional challenge (harmless error doctrine, de facto officer doctrine, rule of necessity, and broad prudential considerations). (Comm'r's Br., ECF # 10, PageID 573-76). *See, e.g., Cary v. Mox*, No. 17-cv-12862, 2018 WL 4402939, at *10 n.6 (E.D. Mich. Aug. 14, 2018) ("Because Defendants Washington and Leach are entitled to summary judgment on the basis of exhaustion, and in the interest of judicial economy, the Court does not reach their alternative arguments for dismissal or summary judgment."), *report and recommendation*

## II.     The ALJ's functional domain evaluation.

To functionally equal the listings, an impairment(s) must be of listing-level severity; i.e. it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *See* 20 C.F.R. § 416.926a(a); SSR 09–1p. In determining whether a child has a "marked" or "extreme" limitation, the ALJ will:

> consider your functional limitations resulting from all of your impairments, including their interactive and cumulative effects. We will consider all the relevant information in your case record that helps us determine your functioning, including your signs, symptoms, and laboratory findings, the descriptions we have about your functioning from your parents, teachers, and other people who know you, and the relevant factors explained in §§ 416.924a, 416.924b, and 416.929.

20 C.F.R. § 926a(e). The factors set forth in §§ 416.924a, 416.924b, and 416.929 include, but are not limited to the following: how well a child can initiate and sustain activities; how much extra help a child needs; the effects of structured or support settings; how a child functions in school; and the effects of medications or other treatment. *See* 20 C.F.R. § 416.926a(a). In determining whether a child functionally equals a listing, the ALJ need not discuss all considerations set forth in 20 C.F.R. § 926a and SSR 09–1p; however, the ALJ must "provide sufficient detail so that any subsequent reviewers can understand how they made their findings." SSR 09–1p.

The domain of attending and completing tasks considers the child's ability to focus and maintain attention, and to begin, carry through, and finish activities or tasks. SSR 09-4p. Also considered are the child's ability to initiate and maintain attention (including alertness and ability

---

*adopted*, 2018 WL 4385793 (E.D. Mich. Sep. 14, 2018); *see also Butcher v. Comm'r of Soc. Sec*, No. 2:20-CV-6081, 2021 WL 6033683, at *8 (S.D. Ohio Dec. 21, 2021) ("Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations."), *report and recommendation adopted*, 2022 WL 523519 (S.D. Ohio Feb. 22, 2022).

to focus on an activity or task despite distractions), perform tasks at an appropriate pace, change focus after completing a task, avoid impulsive thinking and acting, and organize, plan ahead, prioritize completing tasks, and manage time. (*Id.*). Some examples of limitations in this domain include being easily startled, distracted, or overreactive to everyday sounds, slow to focus on or failure to complete activities that interest the child, gives up easily on tasks that are within the child's capabilities, repeatedly becomes sidetracked from activities or frequently interrupts others, needs extra supervision to stay on task, and cannot plan, manage time, or organize himself in order to complete assignments or chores. (*Id.*). The ALJ concluded E.P.I.C. has a less than marked limitation in attending and completing tasks and explained his reasons as follows:

> During an Autism evaluation in 2019, the psychologist found that the claimant was easily distracted by external stimuli. His mother stated that the claimant fidgets, moves around often, and does not remain in his seat was required to do so. At a psychological consultative examination, the psychologist stated the claimant had high energy in which he was frequently out of his chair, touching items in the office, and impulsive. On a simple task to assess attention/concentration, the claimant recited the alphabet in eight seconds with no errors. At the hearing, the claimant testified that he liked to play video games and watch videos. He plays many different video games in which he plays them on his computer and on the Nintendo Switch; he said he was good at these games. In the function report, the claimant's mother stated he could keep busy on his own and work on arts and crafts projects. She stated he did not finish what he started, do his homework, or complete chores most of the time. Therefore, the record supported a less than marked limitation in this domain.

(Tr. 26) (internal citations omitted).

I find the ALJ did not provide a sufficient analysis of this domain. The ALJ's stated reasons for finding E.P.I.C. less than marked in the domain of attending and completing tasks is that he could focus long enough to recite the alphabet—eight seconds—and could pay attention when doing activities he enjoys, such as arts and crafts and playing video games. (Tr. 26).

But this domain is not just concerned with how long a child can attend to tasks he enjoys doing, or what the child can do in fleeting moments of focus. Moreover, the ability to intensely focus on things of interest to a child does not indicate the child can focus on all tasks. SSR 09-4p. Rather, as noted above, this domain assesses a variety of behaviors and skills, including the child's ability to manage his time, stay on task without extra supervision, and control impulsive thinking. As explained in 20 C.F.R. § 416.926a(h), it involves the ability to filter out distractions and remain focused on an activity or task at a consistent level of performance, and focusing long enough to initiate and complete a task. Here, although the ALJ recites some of the record evidence regarding these issues at various points in the decision, the ALJ does not meaningfully analyze the evidence or discuss how she reached her conclusion that E.P.I.C. had a less than marked limitation in the context of the domain of attending and completing tasks.

This is problematic as the record is replete with evidence of E.P.I.C.'s difficulties with impulse control, task completion, and maintaining focus in spite of distractions. For example, after just thirty minutes into the speech and language evaluation, E.P.I.C. got up from his seat, paced the room, and stood on his chair. (Tr. 395). The speech pathologist opted to suspend the evaluation so that E.P.I.C. could attend an evaluation with the occupational therapist so that he "could experience movement." (*Id.*). The remainder of the speech and language evaluation had to be performed while E.P.I.C. explored a basket of toys on the floor. (*Id.*). As described above, E.P.I.C. often required cajoling, prompting, and redirection to initiate and complete tasks he did not want to do, like produce writing samples or take out one trash can, and has displayed escape behaviors, thrown tantrums, and claimed to be unable to produce writing samples to get out having to complete the task. (Tr. 386-87, 381, 382). These behaviors and limitations are all

arguably relevant to the domain. The ALJ did not adequately address any of this evidence, making it unclear whether the ALJ simply ignored it or discounted it for some unarticulated reason. Failing to do that, the ALJ has not built an accurate and logical bridge between the evidence and his conclusions, requiring remand. *Fleischer*, 774 F. Supp. 2d at 877.

On remand, the ALJ should address all relevant evidence, including the test results and interpretations, observations, and assessments from the second evaluation team review. If the ALJ's review reveals information relevant to the other functional domains, the ALJ should reassess his conclusions as to those domains as well.

### III.    Listing 112.10

Ms. Claudio argues the ALJ failed to consider whether E.P.I.C. met the listing for ASD. (Pl.'s Br., ECF #8, PageID 546). Listing 112.10 requires medical documentation of both (1) qualitative deficits in verbal communication, nonverbal communication, and social interaction; and (2) significantly restricted repetitive patterns of behavior, interests, or activities. 20 C.F.R. Part 404, Subpart P., Appendix 1. In addition, the child must have an extreme limitation in one, or a marked limitation of two, of the Paragraph B areas of mental functioning, including the ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.* The Paragraph B categories are very similar to the six domains in functional equivalence.

I do not reach this alleged error because, on remand, the ALJ's more robust analysis of all the relevant evidence of record, including test results, assessments, and observations from all relevant sources of information may impact her findings under the disability evaluation. *See Gresham v. Comm'r of Soc. Sec.*, No. 1:13-cv-1178, 2014 WL 3749375, *11 (N.D. Ohio July 30,

2014) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's determination might impact her findings). I thus recommend the District Court instruct the ALJ to reevaluate all of the relevant evidence of record, which may include a reconsideration of whether E.P.I.C. meets Listing 112.10.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **REVERSE** the Commissioner's decision denying supplemental security income and **REMAND** this matter for proceedings consistent with this recommendation.

Dated: August 5, 2022

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018

WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).